## ECKSTEIN v. UNITED STATES.

No. 42075.

Court of Claims.

March 4, 1935.

Harry B. Sutter, of Chicago, Ill. (Albert L. Hopkins, Jay C. Halls, Anderson A. Owen, Samuel H. Horne, and Hopkins, Sutter, Halls & DeWolfe, all of Chicago, Ill., on the brief), for plaintiff.

George H. Foster, of Washington, D. C., and Frank J. Wideman, Asst. Atty. Gen., for the United States.

Before BOOTH, Chief Justice, and GREEN, LITTLETON, WILLIAMS, and WHALEY, Judges.

LITTLETON, Judge.

Plaintiff sues to recover income taxes of $21,643.10 for 1926 and $22,657.61 for 1928. The income upon which this tax was computed and paid was derived from business carried on in buildings located or constructed upon lands reserved by the state of Illinois, located in the city of Chicago, and leased, in two instances, to persons of whom plaintiff was the assignee and, in one instance, to the plaintiff and others, by the board of education of the city of Chicago under authority of the state.

Plaintiff contends that the United States was without power under the constitutional limitation to tax the income derived by him, as lessee, from three leases made by the board of education as a means of raising funds exclusively for school purposes in furtherance of the express trust for the use of schools upon which the leased premises had been granted by the United States to the state of Illinois upon its admission into the Union; title to the premises since then, at all times, having been held by the state and its political subdivision in trust for school purposes.

The lands, upon which the leases involved in this case were granted, were reserved exclusively for school purposes, and the rentals received therefor by the board of education were devoted exclusively to the maintenance and operation of public schools, an essential governmental function.

The facts concerning the three leases and the income of plaintiff are as follows:

### The Mercantile Lease.

On and prior to May 8, 1880, and continuously to the present time, the title to lots 4, 5, and 6 in block 142, school section addition to the city of Chicago, a subdivision of section 16, township 39 north, range 14, east of the third principal meridian, Cook county, Ill., was in the city of Chicago for the use of schools. These lots are located on the west side of State street between Madison and Monroe streets. On the date mentioned, and at the time of the execution of the lease hereinafter mentioned, these lots were improved with a large and substantial business building. Pursuant to the authority vested in it by the Legislature of the state of Illinois, the board of education of the city of Chicago on May 8, 1880, entered into a lease of these lots with one Thomas Mackin, demising and renting to him the land and building for a term of 50 years, the lease to expire May 7, 1930. A copy of this lease is attached to the petition as Exhibit A.

The rent reserved in this lease was $6,624 per annum until 1885, and thereafter the rent was to be 6 per cent. of the appraised value of the land exclusive of improvements, one such appraisal to be made, in the manner provided in the lease, in 1885 and one every 5 years thereafter until the end of the term. The lessee agreed to pay all water rates and taxes, if any, and the lessor retained the right to terminate the lease if these charges should remain unpaid for 30 days after notice. It was provided that the rent reserved was a first lien on the lessee's interest in the lease and that the same might be sold if the rent remained unpaid for 30 days. The board of education also retained the right to terminate the lease in such event, or upon the breach of any other covenant. The lease was assignable if the lessee had fully performed the covenants to be kept by him and upon notice given to the board of education in writing.

The lease also provided: "That if, upon the expiration of this lease or of any renewal thereof, the party of the first part

shall determine to lease said lots to any other person than the party of the second part, * * * such lease shall only be made upon the condition that, before the delivery thereof, the proposed new lessee shall buy of the party of the second part [lessee], * * * the buildings then standing upon said lots, and pay therefor the value thereof as the same may be appraised by two disinterested appraisers, freeholders in said city; * * * Provided, however, that this covenant shall continue in effect only so long as the party of the second part, * * * on the expiration of this lease and of any renewal thereof, to take and accept a renewal thereof, upon the same terms and conditions, herein provided, for such further term as the party of the first part may determine upon. Provided the city of Chicago, upon the request of said parties of the first part, do not elect to sell the within described premises." It was also provided that, if at such time the city, at the request of the board of education, should elect to sell the lots, the lessee should have the right to purchase the same at their appraised value, exclusive of improvements, and, if he should fail to do so, all interest of his therein should cease.

This lease was later modified or supplemented on four separate occasions. June 15, 1888, as a result of a dispute between the board of education and the lessee, Mackin, the parties in settlement entered into a supplemental agreement modifying the original lease by extending the term thereof to May 8, 1985. The supplemental agreement is attached to the petition as Exhibit B. It provided that the 1885 appraisal of the land should stand as a basis for determining the annual ground rent to be paid until 1895 and that an appraisal should not be made except once in 10 years thereafter. The method of selecting the appraisers was altered and the method of making the appraisals of the land was further defined; a general provision that the lease could only be forfeited on 60 days' notice was incorporated.

By reason of the death of Thomas Mackin and others who became interested in this lease, title to the leasehold descended to John J. Philbin, Jr., individually and as administrator of the estate of Alice Philbin, deceased, and as guardian of the estates of Alice M. Philbin and Mildred Philbin, minors. In those capacities John J. Philbin, Jr., on March 28, 1898, entered into an agreement with the board of education modifying the original lease of May 8, 1880,

and the 1888 supplement thereto, by which modification all provisions for appraisals of the land and for the determination of the rent reserved on the basis thereof were eliminated from the lease, and the rent reserved was fixed at specific amounts of $27,000 per annum from May 8, 1898, to May 8, 1905; $28,350 from 1905 to May 8, 1915; $29,767.50 from 1915 to May 8, 1925; and $31,255.87 from 1925 to May 8, 1985. In addition, the lessee covenanted to erect improvements on the premises of a value of not less than $250,000, consisting of a new fireproof building, the plans and specifications to be approved by the board of education. This improvement was to be completed by the end of 5 years from April 30, 1898. The building was to remain the property of the lessee.

July 17, 1901, Philbin entered into another agreement with the board of education modifying the lease in question by extending the time for completion of the new building to 1905, reducing the agreed cost to $200,000, and confirming the fixed annual rental reserved.

Thereafter this lease to lots 4, 5, and 6 and the leasehold estate was assigned and conveyed May 22, 1902, to Louis M. Stumer, Benjamin J. Rosenthal, LaVerne W. Noyes, and the plaintiff, Louis Eckstein, as tenants in common, each taking a one-fourth interest therein. The cost of the lease to these assignees was $91,277.84.

June 15, 1904, plaintiff and his cotenants entered into a further agreement with the board of education by which the lease was so modified as to extend the time for completion of the new building, the cost of construction of which they assumed, to October 1, 1905; in all other respects the lease, as theretofore modified, was confirmed.

July 10, 1918, Noyes assigned and conveyed his interest in the lease to the University of Chicago. March 1, 1920, Rosenthal assigned and conveyed his one-fourth interest in the lease in equal shares to his wife, Hannah S. Rosenthal, and his daughters, Elaine R. Reinhardt and Gladys R. Byfield (Gladys R. Tartiere), being a one-twelfth interest in the lease to each of them.

June 30, 1920, plaintiff, Louis Eckstein, assigned and conveyed one-half of his one-fourth interest in the lease, or a one-eighth interest therein, to his wife, Elsie S. Eckstein.

Louis M. Stumer died testate, a resident of Cook county, Ill., on July 14, 1919. Un-

der the terms of his will, duly admitted to probate, his one-fourth interest in the lease passed to the trustees of his estate, and his share of the income derived from his interest in the lease and the building constructed on the leased lots was and is distributable one-fourth to Blanche Stumer Giddens, one-twelfth each to Lois Stumer Sidenberg, Aline Stumer Von Rhau, and Louis M. Stumer II, and, after the payment of certain small annuities, the balance was and is to be retained by the trustees.

The new building which the lessee had covenanted to construct on the land was duly completed by plaintiff and his colessees in 1905, prior to October 1, at a cost of $327,075.49. It is a six-story building, faced with terra cotta, and constructed of steel and concrete on caisson foundation. This building was constructed on the leased lots 4, 5, and 6, and the building bears the street number of 10–14 South State street.

On March 1, 1913, the fair market value of the lessees' interest in the leasehold interest in the land, exclusive of the building and improvements, under the terms of this lease, was not less than $1,100,000.

### The North American Lease.

On and prior to December 13, 1900, and continuously to the present, the title to lots 35, 36, 37, and 38 in block 142, school section addition to the city of Chicago, a subdivision of section 16, township 39 north, range 14 east of the third principal meridian, Cook county, Ill., was in the city of Chicago for the use of schools. These lots are located at the northwest corner of State and Monroe streets in Chicago. On the date mentioned, and at the time of the execution of the lease hereinafter mentioned, these lots were improved with a large and substantial business building. Pursuant to the authority vested in it by the Legislature of the state of Illinois, the board of education, city of Chicago, on December 13, 1900, entered into a lease of these lots with Louis M. Stumer, Benjamin J. Rosenthal, and plaintiff, Louis Eckstein, demising and leasing to them the land and building for a term of 99 years and 4 months, the lease to expire April 30, 2000. A copy of this lease is attached to the petition as Exhibit F. The rent reserved in this lease was $47,500 from January 1, 1901, to April 30, 1902; $47,500 per annum to April 30, 1905; $49,-875 per annum to April 30, 1915; $52,368.75 per annum to April 30, 1925; and $56,434.18 per annum to April 30, 2000, payable quarterly in advance, except as to the first 16 months. The lessees covenanted to pay all water rates and taxes, if any, and the lessor retained the right to terminate the lease if same should remain unpaid for 60 days after notice. It was provided that the rent reserved should be a first lien upon the lessees' interest in the lease and all improvements, and that the same might be sold at auction to the highest bidder if the rent remained unpaid for 60 days, the proceeds to apply on the amount in default and costs and any excess of the proceeds over such charges to be paid to the lessees. The board of education also retained the right to terminate the lease if the rent remained unpaid for 60 days, or, in the case of default in the other covenants, to be kept by the lessees.

The lessees agreed, upon delivery of possession, to remodel the building at that time on the land, at their expense, at a cost of not less than $50,000, and to erect thereon, at their expense, a new fireproof building to be completed for occupancy and to be free of liens on or before May 1, 1912, at a cost of not less than $300,000. Title to these improvements was to be in the lessees. In this connection the lease contained a provision for a guaranty deposit by lessees of $5,000 per annum, commencing January 1, 1901, and a remission of rent by the city of Chicago during the construction of the new building for a period of 8 months. If the lessees failed to pay all mechanics' liens for a period of 30 days after notice, it was provided that the board of education might pay the same and add the amount to the rent, with interest, or it might terminate the lease.

The lessees further covenanted to keep the building then on the premises insured for $50,000 and the new building, when completed, for $110,000, the insurance to be payable to the board of education as lessor, to be held as security for the rent and paid out to defray the cost of repairing or replacing the buildings. The lessees agreed in case of destruction of the improvements by fire to rebuild the same at their expense, subject to the application of the insurance moneys, at a cost, in the case of the building then on the premises, of not less than $50,000, and in the case of the new building of not less than $300,000. It was provided that, in the event such destruction should take place at the end of the term, the insurance money was to be paid to the lessees to the extent of the lessor's then obligation to pay the lessees for the improvements on the land. The lessees were given the addi-

tional right of insuring their own interest in the premises, and all surplus insurance moneys collected by the lessor were payable to the lessees.

According to its terms, the lease was assignable by the lessees, provided all covenants to be kept by them had been performed, and provided that no assignment could be made prior to the erection of the new building without the consent of the board of education.

The lease also provided that at the end of the term, if the parties had not theretofore agreed in writing as to the cash value of the improvements, exclusive of land, an appraisal should be made by three disinterested appraisers to determine such value, which could not in any case exceed the cost of construction less depreciation. The board of education agreed to purchase, at the end of the term of the lease on April 30, 2000, the improvements then on the land at their value as determined by the appraisers, to be paid either in cash or one-fourth in cash and the balance over a period of 3 years with interest, the deferred payments to be secured by a first mortgage on the improvements or by such other security as might be agreed upon. The lessees agreed to convey the improvements upon the land to the lessor at the end of the term, and the lease further provided that at the end of the term the title to all the buildings and fixtures should revest in and become the property of the board of education without any such conveyance but without prejudice to the lessees' right to the payment of the cash value thereof. The lessees were given a first lien on the premises as security for the value thereof in the event the value had not been ascertained prior to the end of the term of the lease.

By this lease, Stumer, Rosenthal, and plaintiff each took a one-third interest therein as tenants in common. March 1, 1920, Rosenthal assigned and conveyed his one-third interest in the lease to the lots and his interest in the improvements thereon in equal shares to his wife and two daughters, or a one-ninth interest in the lease and the leasehold estate to each of them.

June 30, 1920, plaintiff assigned and conveyed one-half of his one-third interest, or a one-sixth interest therein to his wife.

As hereinbefore stated, Stumer died July 14, 1919, and by his will his one-third interest passed to the trustees of his estate, and under the terms of the will his income from his interest in the leasehold estate was distributable to the same persons and in the same manner as in the Mercantile lease, hereinbefore referred to.

The new building which the lessees agreed to construct on the land was completed in 1912, prior to May 1, at a cost of $1,681,028.32. It is a nineteen-story building, faced with terra cotta, and constructed of steel and concrete on caisson foundation. This building, known as the North American building, bears the street No. 36 South State street.

At the time of construction of this building, the lessees mortgaged their leasehold interests in the land and their interests in the building for $1,000,000; the money being borrowed for the purpose of defraying a part of the cost of construction. The principal of the mortgage was repayable in installments of $35,000 annually, commencing May 1, 1915, and continuing to and including May 1, 1931, with a final payment of $405,000, due May 1, 1932, and bore interest at the rate of 5 per cent. To obtain this loan, the lessees paid a commission of $25,000.

On March 1, 1913, the fair market value of the lessees' interest in the lease on the land, exclusive of the buildings and improvements, under the terms of this lease, was not less than $2,000,000.

### The Kresge Lease.

On and prior to May 8, 1880, and continuously to the present time, the title to lots 31 and 32 in block 142, school section addition to the city of Chicago, a subdivision of section 16, township 39 north, range 14 east of the third principal meridian, Cook county, Ill., was in the city of Chicago for the use of schools. These lots are located on the west side of State street, between Monroe and Madison streets, being known as 28–30 South State street. On the date above mentioned and at the time of the execution of the lease hereinafter mentioned, each of these lots was improved with a substantial four-story brick business building. Pursuant to the authority vested in it by the Legislature of the state of Illinois, the board of education of the city of Chicago on May 8, 1880, entered into a lease of lot 31 with Robert D. Sheppard, and into a lease of lot 32 with Thomas G. Otis, by each of which leases the board of education demised to the respective lessee the respective lots and the buildings thereon for a term of 50 years, each of the leases to expire May 7, 1930. Copies of these leases are attached

to the petition as Exhibits G and H, respectively.

The provisions of each of the leases were the same, except that the rent reserved by the lease of lot 31 to Sheppard was $2,376 per annum until 1885, while in the lease of lot 32 to Otis the annual rental was $2,160 until 1885. Thereafter, by the terms of each lease, the rent reserved was 6 per cent. of the appraised value of the land, exclusive of improvements, one such appraisal to be made in each case, in the manner provided, in 1885 and one every 5 years thereafter until the end of the respective terms; the rent being payable quarterly in advance at the office of the school agent of the board of education. In each lease the lessee covenanted to pay all water rates and taxes, if any, and the lessor retained the right to terminate the lease if such charges remained unpaid after the property was advertised for sale. Each lease provided that the rent reserved was a first lien upon the lessee's interest in the lease and all improvements and that the same might be sold if the rent remained unpaid 30 days. The board of education also retained the right to terminate the lease in such event or upon breach of the other covenants to be kept by the lessee. It was provided that no assignment should be valid unless the lessee had fully performed the covenants to be kept by him or until notice thereof was given the board of education in writing. Each lease also provided that at the end of the term, in 1930, the lessee might renew the lease for a period of 20 years from that date upon the same terms, provided the city of Chicago did not elect to sell the premises upon request of the board of education. It was further provided in each lease that, in case the city should elect to sell the land, the lessee might purchase the same at the appraised value thereof, exclusive of improvements, the lessee to be extended reasonable credit in the payment of the purchase price. In the event the lessee should not elect to purchase the premises after receiving 30 days' notice of the appraisal, it was provided that the lessee should forfeit all rights in the premises and the improvements thereon.

On April 1, 1884, Sheppard assigned and conveyed the lease to lot 31 and all his interest in the leasehold estate thereby created to Frederick Haskell, and on June 15, 1888, Haskell entered into an agreement with the board of education modifying and supplementing the lease. A copy of the supplemental agreement is attached to the petition as Exhibit I. By this supplemental agreement the term of the lease was extended to May 8, 1985, and it was provided that the 1885 appraisal theretofore made should stand as a valid appraisal for 10 years from that date as the basis for determining the rent reserved under the lease. Under this supplemental agreement, no new appraisal was to be made until 1895, and thereafter appraisals were to be made only once in every 10 years. The method of selecting appraisers was altered; it being provided that the board of education, the judge of the federal Circuit Court for Northern Illinois, and the judge of the probate court of Cook county, Ill., should each appoint one appraiser. The lease provided "that, notwithstanding anything in said lease contained, the appraisers shall be at liberty in forming their judgment of the value of the land, without including the value of the improvements thereon, to take into consideration, if and so far as they deem it pertinent to do so, the improvements on such land, and the character, condition, value, cost, rental, expenses, and other particulars thereof, and any other facts or information, from whatever source, bearing upon the question of the actual value of said land; and it shall be the duty of the lessee to furnish the appraisers promptly, on request, a statement showing the rental receipts and disbursements on account of said improvements for five years, as near as may be, next preceding the time of the appraisement." A general provision was incorporated that the lease could only be forfeited by the lessor after 60 days' notice to the lessee.

June 15, 1888, Otis entered into an agreement with the board of education modifying and supplementing the lease of lot 32, theretofore entered into between him and the board. A copy of the supplemental agreement is attached to the petition as Exhibit J. The terms of this supplemental agreement were substantially identical with the terms of the supplemental agreement entered into on that date between the board of education and Haskell with respect to the lease of lot 31, as above set forth.

Thereafter the leases of lots 31 and 32, respectively, as modified, and the leasehold estates thereby demised, passed by assignment and conveyance, on June 28, 1902, by Otto Young to Louis M. Stumer, Benjamin J. Rosenthal, and plaintiff, Louis Eckstein, the assignees paying the then owners of the leases $85,000 therefor.

As hereinbefore stated, Stumer died in 1919, and, by his will, his one-third interest in the leases of lots 31 and 32 and the improvements thereon passed to the trustees of his estate and, under the terms of his will, the income to which he was entitled therefrom was distributable to the same persons and in the same shares as in the case of the Mercantile lease.

September 19, 1923, Blanche G. Stumer and Chicago Title & Trust Company, as trustees under the will of Louis M. Stumer, and Benjamin J. Rosenthal and plaintiff, as lessors, entered into a sublease demising lots 31 and 32 and the improvements thereon to S. S. Kresge Company, a corporation, as lessee, for a term of 59 years, 11 months, and 28 days commencing May 8, 1925, and ending May 4, 1985. The rent reserved to plaintiff and his colessees was $30,000 per annum, with limitations not here important. Under the terms of the sublease, the Kresge Company agreed to perform all the covenants contained in the original leases entered into between the board of education and Sheppard and Otis, respectively, as supplemented and modified, for the period of such sublease, including the payment of the rent in the original leases reserved to the board of education. In addition, the sublessee, S. S. Kresge Company, covenanted to erect a new building on lots 31 and 32 at its own expense at a cost of not less than $200,000, such building to be completed on or before May 8, 1935. This building was completed in 1925 at a cost of $603,056. By the sublease, the buildings then on the premises were conveyed to the sublessee, and any buildings on the premises at the end of the term, or upon any forfeiture of the lease on breach of the covenant prior thereto, were to be surrendered to Blanche G. Stumer and the Chicago Title & Trust Company, trustees, and to Benjamin J. Rosenthal and plaintiff, as lessors.

The gross revenues accrued to the lessees from each of the Mercantile, North American, and Kresge leases, hereinbefore mentioned, for the calendar years 1926 and 1928, and the expenses and other items incurred in connection with such income and deductible from gross income under the Revenue Act of 1926 (section 200 et seq. [26 USCA § 931 et seq.]) and Revenue Act 1928 (section 1 et seq. [26 USCA § 2001 et seq.]), respectively, for the purpose of determining the tax imposed by those acts, as well as plaintiff's proportionate part of such income and deductions, were as follows:

### 1926

| | North American lease | Plaintiff's share (⅙) | Mercantile lease | Plaintiff's share (⅛) | Kresge lease | Plaintiff's share (⅓) |
|---|---|---|---|---|---|---|
| Gross revenues: | | | | | | |
| Rentals, retail stores | $169,000.00 | .......... | $127,999.92 | .......... | $30,000.00 | .......... |
| Others | 342,921.70 | .......... | | | | |
| Miscellaneous | 5,777.20 | .......... | 539.51 | .......... | | |
| Gross revenues | 517,698.90 | $86,283.15 | 128,539.43 | $16,067.43 | 30,000.00 | $9,999.96 |
| Deductions: | | | | | | |
| Depreciation on building and equipment (as allowed by bureau) | 51,980.85 | .......... | 9,826.32 | .......... | | |
| Amortization of leasehold (as allowed by bureau) | | | 1,099.73 | .......... | | |
| Repairs | 14,046.73 | .......... | 1,914.42 | .......... | | |
| Rent paid | 56,434.18 | .......... | 31,255.80 | .......... | | |
| Taxes paid | 32,806.25 | .......... | 6,108.75 | .......... | | |
| Insurance | 5,536.85 | .......... | 1,100.16 | .......... | | |
| Expenses of change of tenants | 13,707.92 | .......... | | | | |
| Janitor service | 53,818.75 | .......... | | | | |
| Elevator service | 23,564.02 | .......... | | | | |
| Administrative expense | 26,213.74 | .......... | 2,499.96 | .......... | | |
| Heat, light, water, gas, watchman, maintenance, etc. | 17,259.25 | .......... | | | | |
| Interest | 29,392.40 | .......... | | | | |
| Bad debts charged off | 512.12 | .......... | | | | |
| Total deductions | 325,273.06 | 54,212.18 | 53,805.14 | 6,725.64 | None | None |

1928

| | North American lease | Plaintiff's share (⅙) | Mercantile lease | Plaintiff's share (⅛) | Kresge lease | Plaintiff's share (⅓) |
|---|---|---|---|---|---|---|
| **Gross revenues:** | | | | | | |
| Rentals, retail stores....... | $246,008.00 | ............. | $127,999.92 | ............. | $30,000.00 | ........... |
| Others ..................... | 324,565.15 | ............. | ............. | ............. | ............. | ........... |
| Miscellaneous ............... | 5,718.43 | ............. | 556.77 | ............. | ............. | ........... |
| Gross revenues........... | 576,291.58 | $96,048.59 | 128,556.69 | $16,069.58 | 30,000.00 | $9,999.96 |
| **Deductions:** | | | | | | |
| Depreciation on building and equipment (as allowed by bureau)......... | 44,200.68 | ............. | 9,826.32 | ............. | ............. | ........... |
| Amortization of alterations (as allowed by bureau)... | 9,638.45 | ............. | ............. | ............. | ............. | ........... |
| Amortization of leasehold (as allowed by bureau).... | ............. | ............. | 1,099.73 | ............. | ............. | ........... |
| Repairs ..................... | 42,770.57 | ............. | 284.66 | ............. | ............. | ........... |
| Rent paid.................... | 56,434.18 | ............. | 31,255.80 | ............. | ............. | ........... |
| Taxes paid................... | 35,162.50 | ............. | 6,562.72 | ............. | ............. | ........... |
| Insurance ................... | 5,107.60 | ............. | 955.00 | ............. | ............. | ........... |
| Incidental expense........... | ............. | ............. | 261.58 | ............. | ............. | ........... |
| Janitor service.............. | 54,876.67 | ............. | ............. | ............. | ............. | ........... |
| Elevator service............. | 22,325.83 | ............. | ............. | ............. | ............. | ........... |
| Administrative expense..... | 30,736.09 | ............. | 2,499.96 | ............. | ............. | ........... |
| Heat, light, water, gas, watchman, maintenance, etc. ...................... | 17,389.47 | ............. | ............. | ............. | ............. | ........... |
| Interest ..................... | 26,083.34 | ............. | ............. | ............. | ............. | ........... |
| Bad debts charged off....... | 4,137.52 | ............. | ............. | ............. | ............. | ........... |
| Total deductions........... | 348,862.90 | 58,143.82 | 52,745.77 | 6,593.22 | None | None |

Plaintiff duly filed income tax returns for 1926 and 1928, and included therein, as income, his share of the gross income derived from the three leases hereinbefore mentioned for these years, as above set forth; namely, $112,350.54 for 1926 and $122,118.13 for 1928. The amount of the tax shown to be due from plaintiff by his return for 1926 was $39,709.25, which amount was paid in four installments during 1927. The amount of the tax shown to be due from plaintiff by his return for 1928 was $47,778.65, which was paid in four equal installments during 1929.

The income of plaintiff, which he claims was not constitutionally taxable by the United States in this case, was derived by him as rentals from the buildings on the lands leased from the board of education and from the sublease made to the Kresge Company. If the income received by plaintiff from these sources was not subject to taxation by the federal government, plaintiff overpaid his income taxes in the amounts of $21,643.10 for 1926 and $22,657.61 for 1928.

Plaintiff duly filed claims for refund for 1926 and 1928, which claims were disallowed December 19, 1930, and this suit was timely instituted.

Defendant demurs to the petition on the ground that the income in question was taxable to the plaintiff and that the petition does not therefore state a cause of action against the United States. No question as to the statutory net income or the computation of the tax is involved. The sole question presented is whether the federal tax upon the income of plaintiff is invalid under the implied constitutional prohibition against taxation by the federal government of the means and instrumentalities of a state or of a political subdivision thereof.

The income here in question was derived by plaintiff entirely from payments received by him, less various deductions, as rentals received from others for the use and occupancy of the buildings constructed upon lands leased from the board of education of the city of Chicago, acting for the state of Illinois. These buildings were constructed or greatly improved by the lessees or the sublessees.

Plaintiff contends that the taxation of income derived by him as a lessee hampers the efforts of the state in making the best terms possible in the raising of revenue for school purposes and imposes a direct and substantial burden upon the state in the performance of that governmental function; that the leases were instrumentalities for raising revenue over a term of years, and that their entire utility and meaning as an instrument for this purpose are based on the lessee deriving a net return from developing and using the property in conformance with the lease in order to secure funds to pay the lessor the rent reserved and to make a profit; that a tax on his income derived therefrom is a direct burden on the leases and the power of the state to negotiate them; and that a tax, to any extent, is void under the rule laid down in Gillespie v. State of Oklahoma, 257 U. S. 501, 42 S. Ct. 171, 66 L. Ed. 338; Burnet v. Coronado Oil & Gas Co., 285 U. S. 393, 52 S. Ct. 443, 444, 76 L. Ed. 815; and Marland v. United States (Ct. Cl.) 53 F.(2d) 907.

■ It is well established that the implied constitutional prohibition against federal taxation of agencies or instrumentalities of the state is limited to cases where the tax is imposed directly on the governmental instrumentality of the state, or, if not so imposed, its effect is to place a direct and substantial burden upon the exercise of an essential governmental function.

■ The defendant contends that in the present case the tax is imposed upon the plaintiff and not directly upon any state agency; that, as the tax is dependent upon income resulting from the efforts of the plaintiff, and the amount which he is required to pay to the state as rent is not diminished by such tax, it does not place a burden upon the state; that the tax in the case at bar is not a tax upon the leases, nor does it reach the amount of money paid under the leases, and it is in no way measured by the amount of the rent under the lease, nor is the rent under the lease affected by the tax; that the decided cases on the subject have recognized that, in theory, a tax of this kind may have some effect on the amount of the rent reserved in the lease and thus, remotely and indirectly, affect the state, but that this remote and indirect effect upon a government of a nondiscriminatory tax has never been considered adequate grounds for aiding the one at the expense of the taxing power of the other.

Under the facts and circumstances of the instant case, we are of opinion that the income of plaintiff is not exempt from federal taxation. Although such income was made possible by the leasing of the lands in question by the board of education, it actually resulted, in a very large measure, from improvements constructed upon the land, through rentals received from others, and from the individual efforts of the plaintiff and his colessees. The income upon which the tax was exacted did not directly and entirely accrue to plaintiff from that which was leased by the board of education, namely, the land, but from a changed investment of many thousands of dollars, from good personal management of the properties represented by such investments, and from increased rentals and additional investments made upon the land through subleases. We think these facts place this case outside the principle announced in Gillespie v. State of Oklahoma, supra; Burnet v. Coronado Oil & Gas Co., supra; Marland v. United States, supra, and other cases cited, in which the rule for which plaintiff contends was applied. The cases of Willcuts v. Bunn, 282 U. S. 216, 51 S. Ct. 125, 75 L. Ed. 304, 71 A. L. R. 1260, and Marland v. United States, 3 F. Supp. 611, 78 Ct. Cl. 69, in which income was held to be taxable by the United States, are, we think, directly in point here.

In the Willcuts Case the court held that the income derived from the sale of county and municipal bonds by the holder thereof was not exempt from taxation on the ground that the burden on the power of the county and city to borrow money was so remote as not to be directly and substantially affected by the imposition of the tax upon such income, and in the case of Marland v. United States, 3 F. Supp. 611, 78 Ct. Cl. 69, this court held that the income derived by a lessee from the sale of an oil lease on state-owned school lands did not impose such a direct burden upon the state in the making of such a lease as to offend the implied constitutional prohibition. While in the case at bar there was no direct sale by plaintiff and his cotenants of the leases made by the board of education of the city of Chicago, his income, which has been taxed, was not derived directly and entirely from the lands leased. In the Gillespie and Coronado Oil & Gas Co. Cases the income of the lessee which was held to be exempt was derived directly from the thing leased, which is not true in the case at bar. Inas-

240

much as the tax in the instant case was computed upon the income of plaintiff resulting from distinct transactions on his part, we think the taxation of such income imposes no direct and substantial burden on the state of Illinois in leasing the school lands in question. In Burnet v. Coronado Oil & Gas Co., supra, the court stated that: "We are disposed to apply the doctrine of Gillespie v. Oklahoma strictly and only in circumstances closely analogous to those which it disclosed. * * *" We think the facts and circumstances in the case at bar are not closely analogous to those disclosed in the Gillespie Case. In Marland v. United States, 3 F. Supp. 611, 612, 78 Ct. Cl. 69, the facts disclosed that, "if the profits derived from the resale of such leases by the lessees of the state are held subject to income and excess profit taxes by the federal government, that holding will have the effect to restrict and to limit substantially the market for such leases, and to substantially lessen the price obtainable by the state therefor." But we held that such a burden which did not result from a taxation of the income derived directly from the operation of the property leased was so remote as not to offend the implied constitutional prohibition against taxation by the federal government of the means and instrumentalities employed by the state in the performance of an essential governmental function.

Under the facts in the case at bar, we think the burden upon the state of Illinois is no more direct or substantial than the burden upon the counties and cities, as set forth in the Willcuts Case, supra, and upon the state of Oklahoma, as disclosed by the facts in the Marland Case, 3 F. Supp. 611, 78 Ct. Cl. 69, and the decisions in those cases are controlling here.

The demurrer is sustained, and the petition is dismissed. It is so ordered.